JUST, PLAINTIFF AND APPELLEE, *v.* JUST ET AL., DEFENDANTS AND APPELLANTS.

APPEAL from the District Court of San Juan, Section 1, in an Action for Annulment of Marriage.—Motion for Reconsideration.

No. 2503.—Decided July 16, 1923.

MARRIAGE—ANNULMENT OF MARRIAGE—IMPOTENCE—RIGHT OF ACTION.—In reconsideration of the judgment rendered by the Supreme Court in this case on July 8, 1922, it was *held:* That section 179 of the Civil Code does not give to third persons a right of action to annul a marriage because of the impotence of the husband. *Quaere:* Whether this right of action does not correspond exclusively to the wife. It was further *held:* That under that

section of the Code a natural son has not a sufficient interest after the death of his father to sue for the annulment of the marriage on the said ground of impotence, assuming that the father had such right during his lifetime.

The facts are stated in the opinion.

*Mr. Juan de Guzmán Benítez* for the appellants.

*Mr. J. B. Soto* for the appellee.

MR. JUSTICE WOLF delivered the opinion of the court.

In the former opinion in this case, 30 P. R. R. 702, we said that we understood section 179 of the Civil Code as giving the wife alone an interest in annulling a marriage on the ground of impotence of her alleged husband if she was living and was *sui juris.* The appellee insists that no such construction may be put upon section 179 of the Civil Code, as the right is given indiscriminately to all the persons mentioned therein. In our previous opinion reference was made to the jurisprudence of France and Louisiana. Counsel insists that both in France and Louisiana the right to an action of nullity on the ground of impotence is expressly limited.

The suit was brought on the theory that the husband here was not only impotent but of insufficient mental capacity. A woman who marries a man of insufficient mental capacity, knowing the fact, is guilty of a fraud. The marriage is void *ab initio* and there is no way of validating it. Both in Spain as in England and the United States the origin of the rules and laws of marriage and divorce was in the Church. A glance at the history of marriage in England and the United States shows that the right to pray for a nullity of marriage on the ground of impotence generally belonged to the parties if not to the injured party alone, somewhat due to its church origin. Notes to *State* v. *Yoder* and *Bennett* v. *Bennett,* L. R. A. 1916 C, 690–692, 694 *et seq.*

Likewise, we make bold to assert that in the United States as well as in Spain a marriage contract where one of the spouses was impotent was voidable only and not void *ab initio.*

Given these antecedents, in 1902 the Legislature passed the Civil Code of Porto Rico and section 129 provides as follows:

"Sec. 129. Marriage is a civil institution originating in a civil contract whereby a man and a woman mutually agree to become husband and wife and to discharge toward each other the duties imposed by law. It is valid only when contracted and solemnized in accordance with the provisions of law; and it may be dissolved before the death of either party only in the cases expressly provided for in this Code."

We think the mere recital of this section is enough to show that the Legislature intended that the marriage institution should be subject to the same rules of ordinary contract, unless there was something peculiar in the marriage relation which would make it void *ab initio*.

Section 179 of the Civil Code provides as follows:

"Sec. 179. The right to an action for a declaration of nullity of a marriage, belongs to the parties to the marriage, to the public attorney, and to such other persons as may have an interest in the annulment of the same."

The question then arises whether a natural child has a right of action or an interest to annul the marriage of his father. Section 130 of the Civil Code is as follows:

"Sec. 130. The requisites for the validity of a marriage are:
"1. The legal capacity of the contracting parties.
"2. Their consent.
"3. Authorization and celebration of a matrimonial contract according to the forms and solemnities prescribed by law."

Then follows in the Code a so-called "Article First" entitled "Capacity" and includes sections 131 to 135 inclusive of the Civil Code. In these sections capacity and consent are both treated and not clearly differentiated, so that the "legal capacity" of section 130 cannot be equated to the "capacity" to which Article First relates. The appellant maintains, with

a considerable show of reason, that the wide right of annulment given by section 179 must be taken in connection with section 178, immediately preceding, which makes a marriage null and void when not contracted according to the "requirements of the Code." She maintains that the "requirements" or "requisites" are set out in section 130 and that the said wide right to annul only refers to that section and hence to a lack of legal capacity. It would follow that impotence is not a lack of legal capacity, but only a special incapacity like minority or other matters treated in section 131 *et seq.* Legal capacity must then mean the capacity the absence of which would render marriage void *ab initio.* Rights of action for nullity, separate in Spanish times, were grouped together in section 179, and this is another consideration supporting the viewpoint of the appellant, the alleged wife herein, as it seems impossible that the Legislature would have grouped together all rights of action in one section without any consideration of whether the contract of marriage so entered into was absolutely void or merely voidable.

We are inclined to hold, without more, that a contract of marriage merely voidable may be continued or ratified by the acts of the parties, provided they are *sui juris,* as intimated in our original opinion. The wide power of section 179, by including the *fiscal* tends to show that the nullity to be sought was of a public order. When two persons who are of age and of sound mind, have contracted no previous marriage, and nothing else has occurred which would void the marriage *ab initio,* the continuance of the marriage, if voidable, is a matter between the parties and, like other contracts, subject to confirmation, ratification, or the like.

Looking again at sections 130 *et seq.,* it will be seen that the incapacity referred to will sometimes make a marriage void *ab initio* and at other times merely voidable. By specific provisions therein parties in certain cases may ratify the marriage or renounce their rights. A minor who marries

without the consent of his parents may ratify the marriage on coming of age. The pupil, too, who marries her tutor before his accounts have definitely been approved, etc., may likewise ratify when she comes of age. In the case of *Ledesma* v. *Agrait*, 19 P. R. R. 549, we similarly held that the provisions of section 1362 permitted the ratification of contracts which observed the external form of section 1228.

But the principal consideration on which we decide this case is that complainant-appellee has shown no such interest as would entitle him to an action. For this branch of the discussion section 179 may be supposed to refer to any kind of incapacity.

The complainant here could solely derive his right to bring this action by reason of the death of his father. Before that time he had only an interest in expectancy, which is not a sufficient interest, as we pointed out in the case of *People* v. *Alcaide*, 29 P. R. R. 171.

During the lifetime of his father, supposing him to be of sound mind, the right to annul the marriage, if it existed at all, belonged to the complainant's father, who merged in himself the universal rights which, by the Civil Law, descend to an heir. We think it is apparent that section 179 refers to an interest which exists at the time of the marriage or, at least, when the alleged ground of nullity is discovered. It is an interest that must exist at the time the marriage is performed, although the cause of action may arise later on the discovery of the defect. The parties to a voidable contract resulting in marriage are the only ones, excluding the *fiscal*, who have an existing interest in destroying the marriage.

The ancestor not having exercised the right of annulment, if any he had, this right was not one of the causes of action that survived to the heirs. It was personal to the ancestor.

We have said that the *fiscal* perhaps must be excluded, but we seriously question whether the intention of the Legislature was to empower the *fiscal* to annul a marriage between persons *sui juris* when that marriage is solely voidable, unless the government had some real interest in annulling the marriage.

We seriously question, moreover, if not decide, that it is only the wife who may bring an action against her husband on the ground of his impotence. This is the general rule in the United States and we have been cited to no contrary case.

Other considerations lead to the same general result that the Legislature did not intend that a voidable marriage, like the one before us, should be annulled at the instance of an heir, direct or collateral. The present statutory laws of Porto Rico make absolutely no provision for the civil effects of a marriage contracted in good faith. Section 69 of the Spanish Civil Code did so. That section has been suppressed. Children conceived after a voidable marriage might then become not only illegitimate but without civil rights. No provision is made for their status. If a couple, living together for years as man and wife, desired to make their offspring legitimate and one of the spouses was impotent, no such legitimation could take place as against the opposition of an heir. Such results could not be in the mind of the Legislature and it is the duty of the court to give such an interpretation to our statutes as would not lead to these or the other supposed absurdities. *Holy Trinity Church* v. *United States,* 143 U. S. 457.

As the case is being sent back for a new trial, it is unnecessary to decide whether the complainant duly proved that he was the son of the deceased, but the matter may be again presented.

For these reasons we shall again render the judgment

that we formerly rendered and which we now have reconsidered.

*Reversed and remanded.*

Chief Justice Del Toro and Justices Aldrey, Hutchison and Franco Soto concurred.